IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHRISTOPHER M. PAYNE, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CV3017 |
| | ) | |
| v. | ) | |
| | ) | |
| FRED BRITTEN, CHRISTOPHER | ) | **MEMORANDUM** |
| CONNELLY, MICHELLE | ) | **AND ORDER** |
| HILLMAN, LEE TINKLER, | ) | |
| MAILROOM PERSON 1, | ) | |
| MAILROOM PERSON 2, ET. AL., | ) | |
| BENNY NOORDHOEK, CARINA | ) | |
| MCROBERTS, and J KUNZMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Without repeating the complex procedural history of this four-year-old case, the issue before me is whether the defendant prison employees, in their individual capacities,[1] are entitled to qualified immunity as to plaintiff-inmate Christopher

---

[1] At the September 11, 2015, hearing on the defendants' motion for summary judgment (Filing 132), Defendants' counsel stated that plaintiff Christopher Payne's official-capacity claims have already been dismissed. (Filing 148, Restricted Audio File of Oral Arg. on Mot. Summ. J., at 1:13:38-1:14:55.) Consistent with that belief, Defendants' answer (Filing 111) to Payne's amended complaint (Filing 18) was filed on behalf of Defendants "in their individual capacities only," and the motion for summary judgment was filed by Defendants in their individual capacities only. (*See* Filing 133, Br. Supp. Mot. Summ. J. (arguing only qualified immunity); Filing 142, Reply Supp. Mot. Summ. J. (filed by state defendants "in their individual capacities"); Filing 137 (Defendants' Notice of Corrected Signature Block on summary judgment motion, brief, and index of evidence to clarify that items were filed by Defendants "in their individual capacities only").) In neither the September 11 hearing nor in Payne's brief in opposition to the pending motion for summary judgment did Payne's counsel dispute that the only claims remaining in this lawsuit are those asserted against the

Payne's First and Fourth Amendment claims that the defendants withheld 14 pieces of his incoming and outgoing mail for an extended period of time without justification—four of which they still hold and do not intend to return to Payne.[2]

## I. UNDISPUTED MATERIAL FACTS[3]

1.  At all relevant times, Payne was an inmate at Tecumseh State Correctional Institution ("TSCI") in Nebraska, where Payne was and is serving sentences for two convictions of first-degree sexual assault of a child. The defendants were all employed at TSCI: Fred Britten was employed as the Warden; Christopher Connelly was a Captain; Michelle Hillman was the Associate Warden; Lee Tinkler was a Canine Corporal; Benny Noordhoek was an Investigations Officer; Carina McRoberts was a Corporal; and J. Kunzman was a mailroom employee.

2.  On October 13, 2010, Payne received notices that pieces of his incoming

---

prison-employee defendants in their individual capacities only.

[2] I previously determined that the prison-employee defendants have qualified immunity on Payne's claim that the defendants monitored (opened and read) his ordinary mail without a warrant. (Filing 107 at CM/ECF pp. 11-12.) I also clarified that defendant and FBI agent Jerry Bell is no longer an active party to this case because Payne's claims against him were previously dismissed with prejudice, and that decision was not appealed. (Filing 107 at CM/ECF p. 10.)

[3] In accordance with this court's Local Civil Rules, Defendants' brief (Filing 133) in support of their motion (Filing 132) for summary judgment contains a statement of undisputed material facts consisting of "short numbered paragraphs" with pinpoint citations to evidence supporting the stated material facts. NECivR 56.1(a) (underscoring omitted). Because Payne's counsel has not controverted Defendants' statement of facts in Payne's brief (Filing 141) opposing Defendants' motion for summary judgment, Defendants' statement of undisputed material facts is "considered admitted." NECivR56.1(b) (underscoring omitted). The court has condensed and combined some of Defendants' material facts and has added some other undisputed facts, with citations to evidence, as needed for clarity.

and outgoing mail had been withheld pending a criminal investigation, and sometime that month, Payne was notified that his mail had been withheld and monitored in conjunction with a Federal Bureau of Investigation ("FBI") investigation regarding child enticement. During the time the defendants thought the FBI investigation was open, Nebraska Department of Correctional Services ("NDCS") staff forwarded Payne's mail to the local FBI office.

3. In addition to the mail that was withheld on October 13, 2010, several subsequent pieces of Payne's mail were withheld pending the criminal investigation. Court's Exhibit #1 from the September 11, 2015, hearing on the defendants' motion for summary judgment (Filing 132) contains the 14 pieces of mail that are at issue in this case.

4. At all relevant times, Payne was the subject of "institutional mail monitoring." Inspection of Payne's mail was intended to identify information which potentially threatened the safety, security, and good order of TSCI because prison officials were concerned that Payne's incoming and outgoing correspondence contained information regarding possible sexual assaults against minors and that Payne was attempting to contact his victims. As a result of NDCS's mail monitoring, defendant Christopher Connelly, the Investigative Captain at TSCI, believed that:

> Evidence from the mail monitoring indicates Payne is engaging in potential criminal activities inside the facility, to wit: Payne has been running or attempting to run a book making business. Payne is attempting to get people to write sexually erotic stories involving young children. Payne is trying to collect pictures from the internet of prepubescent boys dressed in leotards, swim suits, underwear, etc. to try to put together books to sell to other pedophiles in and out of prison.
>
> Evidence from the mail monitoring further indicates Payne is attempting to set up a pedophile network to share stores, pictures, etc., and is still trying to entice young boys on the internet. Among other things, Payne's incoming and outgoing correspondence contained

3

> information regarding possible sexual assaults against minors and also attempts by Payne to make contact with prior victims.
>
> . . . .
>
> As a result of my investigation, it is my opinion that Payne is a still a danger to children. Payne may not be able to touch them while incarcerated, but he is still trying to entice children. It is apparent from the evidence that Payne is attempting to enter a network of other pedophiles and possibly even assist pedophiles on the outside meet up with potential victims.

(Filing 62-1, Decl. Christopher Connelly ¶¶ 12, 13, 16 (paragraph numbering deleted); *see also* Filing 68 (Sealed), Memorandum from Connelly (communicating belief that mail referenced Payne's victims); Filing 63-1, Decl. Jerry Bell (stating that FBI Special Agent Bell was asked to review Payne's mail items because NDCS suspected the mail "might represent evidence of a violation of federal criminal law relating to child pornography").)

    5.    Payne has filed an affidavit denying that he is attempting to run a book-making business, collecting photographs to sell to others, attempting to set up a pedophile network, assisting others in meeting potential victims, or attempting to contact children or his victims. (Filing 78 at CM/ECF pp. 3-5.) Payne also states that since he has arrived at TSCI, defendant Britten "has reviewed and authroized [sic] my receipt and possession of a large quantity of photographs of males of all agesin [sic] swimsuits and leotards." (Filing 91-1 at CM/ECF p. 2.) Further, Payne has filed an a December 14, 2011, Inmate Interview Request form to which TSCI's reply was, "the mailroom staff have been reminded of the guidelines that photos are reviewed by. Males in acceptable swim suits will be allowed in the future." (Filing 91-1 at CM/ECF p. 5.)

    6.    While evidence on file indicates that the FBI elected not to open an investigation in early 2011, the parties agree that from early 2011 to October 2014,

none of the defendants knew that the FBI had declined to open an investigation of Payne. (Filing 148, Restricted Audio File of Oral Arg. on Mot. Summ. J., at 19:53, 29:19-32:36; Filing 63-1, Decl. Jerry Bell.) However, Payne filed this lawsuit on February 2, 2011—four months after the mail monitoring began—which, according to Defendants, "dictated . . . continued retention" of the letters, so Defendants "retained [the letters] pending resolution of this lawsuit." (Filing 133, Defs.' Br. Supp. Mot. Summ. J. at CM/ECF p. 18 n.2.)

7. Unless a victim requests to speak with an inmate, official NDCS policy precludes inmates from contacting their victims. (Filing 135-3, Administrative Regulation 005.03, Section II(G).)

8. NDCS Operational Memorandum 205.01.01 for TSCI directs staff to search inmates' mail for—and to withhold mail that contains—"contraband," which includes "[m]aterials that advocate or are likely to incite . . . illegal activity, including materials that advocate or depict . . . illegal sexual activity" and "[a]ny other printed, published or photographed materials that are deemed by the Warden to constitute a threat to the safety, security, or good order of the facility." NDCS's definition of "contraband" also includes "*any other items* which in the opinion of the Warden constitute a threat to the security, safety or good order of the institution." (Filing 135-4, Mail Room Procedures, at CM/ECF pp. 2-4 (emphasis added); Filing 135-7, NDCS Administrative Regulation 204.01, Inmate Property Control, at CM/ECF pp. 7-8 (repeating definitions of "contraband").)

9. NDCS Administrative Regulation 205.01 provides that "[c]ontraband which is removed from incoming inmate mail which is not returned to the sender may be turned over to law enforcement authorities for possible prosecution. Contraband not returned to the sender or given to law enforcement will be disposed of according to facility procedures." (Filing 135-8, Inmate Mail, at CM/ECF p. 6.)

10. Title 68 of the Nebraska Administrative Code states that "[a]n inmate's

5

access to the mail will be limited only if the access constitutes a violation of state law, federal law, regulations governing mail or threatens the security, safety or good order of the facility." These regulations repeat that "contraband" includes "[a]ny item that would constitute a threat to the safety, security or good order of the facility," "[a]ny publication . . . that advocates or is likely to incite . . . illegal activity, including materials which advocate or depict . . . illegal sexual activity," and "[a]ny other printed, published . . . or photographed material that the Warden determines is a threat to the safety, security or good order of the facility." (Filing 135-9, at CM/ECF pp. 2-3 (Nebraska Administrative Regulation, Title 68, Chap. 3 § 002).)

11. NDCS employees did not deviate from the Department's procedures in handling Payne's mail.

12. While ten pieces of Payne's withheld mail have now been returned to Payne, NDCS has determined that four pieces of Payne's mail violate institutional policies and should not be turned over to Payne at any time. (Filing 136, Exs. 5-8 (Restricted); Court's Exhibit #1, Exs. 11-14.) NDCS's stated reasons for permanently withholding these four pieces of mail are that the Warden has determined that the first three pieces of mail constitute "contraband" under Administrative Regulations 205.01 and 204.01 and Operational Memorandum 205.01.01, and the last piece of mail violates Administrative Regulation 005.03. (Filing 135-1, at CM/ECF p. 3.)

## II. ANALYSIS

On remand from the Eighth Circuit Court of Appeals, I am directed to consider the "merits of the qualified immunity defense," which "will require the district court to assess whether the regulation or policy at issue under which the mail is being held is valid and neutral and whether it addresses a legitimate penological concern." *Payne v. Britten, 749 F.3d 697, 701-702 (8th Cir. 2014)*. Then I must "conduct an independent review of the evidence to determine if the officials have demonstrated an exaggerated response to those penological concerns in relation to a particular item of

6

mail that has been confiscated." *Id*. at 702 (citing *Kaden v. Slykhuis*, 651 F.3d 966, 969 (8th Cir. 2011); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 985-86 (8th Cir. 2004); *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997)). If the prison officials' actions were not an "exaggerated response," they are entitled to qualified immunity from suit. See *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) ("Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.' *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)." (citation omitted)).

**A. Validity of Regulations Under Which Mail Being Withheld**

NDCS administrative regulations and operational memoranda permit the withholding of inmate mail that constitutes "contraband," which is defined to include "[m]aterials that advocate or are likely to incite . . . illegal activity, including materials that advocate or depict . . . illegal sexual activity"; "[a]ny other printed, published or photographed materials that are deemed by the Warden to constitute a threat to the safety, security, or good order of the facility"; and "any other items which in the opinion of the Warden constitute a threat to the security, safety or good order of the institution."

Payne's counsel has neither challenged the validity nor content-neutrality of any of this language, nor has counsel argued that this language fails to address legitimate penological concerns. (Filing 149, Restricted Audio File of Oral Arg. on Mot. Summ. J., at 1:28:04; Filing 141, Pl.'s Br. Opp'n Defs.' Mot. Summ. J.) However, even if Payne *had* challenged the regulatory language at issue, I find and conclude that the language is valid, content-neutral, and reasonably related to legitimate penological concerns such as protecting the inmates' safety and furthering the institution's rehabilitative and disciplinary goals. See *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1517 (2012) ("The task of determining whether

7

a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." (internal quotation marks and citations omitted)); *Turner v. Safley*, 482 U.S. 78, 93 (1987) ("The prohibition on correspondence is reasonably related to valid corrections goals. The rule is content neutral, it logically advances the goals of institutional security and safety identified by Missouri prison officials, and it is not an exaggerated response to those objectives. On that basis, we conclude that the regulation does not unconstitutionally abridge the First Amendment rights of prison inmates."); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (granting prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 985 (8th Cir. 2004) ("Regulations involving the review of incoming mail in prisons need only be reasonably related to legitimate penological interests." (internal quotation marks and citation omitted)).

### B.  Was Withholding Mail an Exaggerated Response to Penological Concerns?

I have previously determined that it was clearly established by the time the defendants acted that prison authorities cannot hold mail indefinitely by exercising their authority to screen an inmate's mail "overzealously." (Filing 107 at CM/ECF pp. 12-13.)  *See Kaden*, 651 F.3d at 969 (relying on Eighth Circuit authority dating back to 1997 and stating, "[I]f a valid prison regulation is applied to particular mail items in such a way as to negate the legitimate penological interest, the regulation may be unconstitutional as applied to those items. . . . On appeal, we must independently review the evidence to determine whether [the] decision to apply the regulation and withhold [the particular mail items] was an exaggerated response to prison concerns and therefore unconstitutional as applied." (internal citations and quotation marks omitted)); *Murphy, 372 F.3d at 985-986* (before prison authorities can censor materials, they must review each item; court must conduct independent review of evidence "to determine if there has been an exaggerated response to prison concerns in relation to this particular item" (internal quotation marks and citation omitted));

8

*Williams*, 116 F.3d at 354 (question in prison case where inmate challenged withholding of mail was whether the ban on "the particular materials that were withheld" from the prisoner was "reasonably related to a legitimate penological objective" or "an exaggerated response to prison concerns").

Therefore, the qualified-immunity issue now before me is whether the defendants violated this clearly established law when they withheld ten pieces of Payne's mail from 2010 to 2014 and four pieces of Payne's mail permanently.

The defendants maintain that they (1) withheld 14 pieces of Payne's mail, first because they agreed to forward such mail to the FBI as part of its pending criminal investigation into allegations of child enticement, and then because the letters became the subject of litigation when Payne filed this lawsuit on February 11, 2011; (2) returned ten pieces of that mail to Payne in October 2014 once the defendants belatedly became aware that the investigation had ceased due to poor communication between NDCS and the FBI; and (3) have permanently withheld four pieces of mail that violate NDCS Administrative Regulations 005.03, 204.01, and 205.01; Title 68 of the Nebraska Administrative Code; and Tecumseh State Correctional Institutional Operational Memorandum 205.01.01. (Filing 133, Defs.' Br. Supp. Mot. Summ. J. at CM/ECF pp. 15-16.)

### 1. Ten Pieces of Mail Returned in October 2014

The ten pieces of Payne's mail that Defendants withheld from October 2010 to October 2014 are briefly described below[4]:

(1)  Letter to Payne, apparently responding to questions Payne had asked the author of the letter, who wrote: "My friend that had sex with the 13 yr. old, had it a

---

[4] The numbers below correspond to Court's Exhibit #1 from the September 11, 2015, hearing on the defendants' motion for summary judgment.

number of times, and no he never got caught, and no I don't see him anymore."

(2)     Letter to Payne that contains a graphic description of the author's sexual encounter with a man that was viewed by a "cute little blonde" boy scout, a description of the author's viewing of a 11-year-old girl's "little breast buds," an apology for not "having a computer and printer yet," and a statement that "I don't [sic] feel real comfortable in spying on your ex for you.  But since I care about you send me what information you have and I will see what I can do."

(3)     Letter to Payne from Omaha, Nebraska, in which the author states that he has "been working on your transcript"; that "I continue to drive by that address you gave me on 84th and continue to find no one there. At night the lights are on inside but the curtains are always closed.  No cars are ever parked in the driveway or street for that matter."; and that "I haven't had a chance to do a web search for those leads you gave me." One of Payne's two convictions for first-degree sexual assault of a child stems from an incident occurring in Omaha.

(4)     A cover letter to Payne with an attached article entitled, "Normative Sexual Behavior in Children:  A Contemporary Sample" from *Pediatrics*, the official journal of the American Academy of Pediatrics. The article discusses sexual behaviors exhibited by 2- to 12-year-old children, information a sexual predator would likely want to know.

(5)     Letter to Payne with an attached story stating, "if I have a short couple of chapters or a very long one, I'll try to remember to send you the story I wrote a few years ago . . . ."; "I have a problem with a guy who has adopted sons, gets into boys and well I just can't see him not going after them or at least their friends . . . ."; and telling Payne to "enjoy the stories and the picture."

(6)     Letter from Payne describing his request to TSCI Warden Britten to allow Payne to receive photographs of his friend's young male gymnastics students

"wearing leotards and gymnist [sic] shorts"; asking the recipient of the letter to "capture images" from various television episodes and movies that portray attractive boys with certain sexual physical features; and asking the recipient to "see if my prisonpenpals.com ad is still up" and to "check out my lifeout.com ad; print for me."

(7) Letter from Payne asking the recipient of the letter to "send the photos of the gymnists [sic]"; discussing catalogs he had ordered containing 7- to 9-year old boys wearing "little leos and tiny shorts"; describing a bookseller "who specializes in BL media" from whom he ordered a "Boys in Sports" calendar that pictures young boys; describing his sexual attraction to young boys and their physical attributes; describing Payne's "boy on boy" writing and his "friend who is helping to convert [his] writing to digital format"; and promising recipient that Payne "will gladly share with you" his writing, which is "graphically detailed."

(8) Letter from Payne stating he is "glad to hear that you are still with me and on the 'same page.' It is truly hard to find like-minded guys in this world, unless you have the internet. Without it, it's near impossible. You are the very first person to properly interpret my subtle clue in my ad."; describing his physical relationship with a 13-year-old boy and Payne's preference for pre-pubescent boys between ages 8 and 13; graphically describing Payne's sexual experiences with young boys; mentioning that "I've got a guy who is supposed to be typing the stuff into the computer for me, but he is slacking. He's typed 3 stories in the past 6 months. I'm trying to find someone new to help with it, but it's hard because . . . the content is . . . you know . . . But, as soon as I can, I will hook you up."; asking recipient if he "ever write[s] erotic fiction" and promising to send him a short story; asking recipient to send photos of young boys in "swimsuits or athletic attire"; and referring recipient to internet site for "boy photos."

(9) Letter from Payne asking recipient how old he was when he realized he "liked boys" and when he "did anything sexual with another boy."

11

(10) Letter from Payne describing his sexual history and tendencies; stating that he's "been with two guys who weren't over 13" and other "teens"; and describing his male anatomy and preferred sexual activities, including "infantilism."

Whether or not Payne was *actually* involved in child enticement or marketing and developing a pedophile network from inside TSCI, the defendants' decision to withhold the above-described mail cannot be characterized as an "exaggerated response" to TSCI's concern of preventing possible sexual assaults against minors on the "outside," as well as TSCI's rehabilitative and safety interests in stopping Payne's possible attempts to contact his victims using people outside the prison, to enter a network of other pedophiles, to assist pedophiles on the outside in meeting potential victims, to invite people on the outside to write sexually erotic stories involving young children, and to collect pictures of prepubescent boys dressed in leotards, swimsuits, and underwear for the purpose of creating books to sell to other pedophiles inside and outside of prison. (*See* Filing 62-1, Decl. Christopher Connelly ¶¶ 12, 13, 16; Filing 68 (Sealed), Memorandum from Connelly (communicating belief that mail referenced Payne's victims).)

It was entirely reasonable for the defendants to withhold mail that suggested Payne's involvement in child enticement during the time frame that TSCI officials thought[5] the FBI was criminally investigating Payne. (Filing 135-8, NDCS Administrative Regulation 205.01, Filing 135-8, Inmate Mail, at CM/ECF p. 6 ("[c]ontraband which is removed from incoming inmate mail which is not returned to the sender may be turned over to law enforcement authorities for possible prosecution").)

---

[5]Recall that all parties agree that from early 2011 to October 2014, none of the defendants knew that the FBI had elected to *not* open an investigation of Payne. (Filing 148, Restricted Audio File of Oral Arg. on Mot. Summ. J., at 19:53, 29:19-32:36.)

Further, after Payne filed this lawsuit in February 2011, it was reasonable for the defendants to preserve the mail for litigation which, four years later, is still ongoing. *See Gallagher v. Magner*, 619 F.3d 823, 845 (8th Cir. 2010) (district court may impose sanctions when party destroys evidence after litigation commences); *Strutton v. Meade*, No. 4:05CV2022, 2010 WL 1253715, at *15 n.7 (E.D. Mo. Mar. 31, 2010) (in case challenging constitutionality of Missouri Sexual Offender Treatment Center's interruption of "process groups," court noted that the Center employees' "failure to impose a litigation hold on facility e-mails after [the plaintiff] filed this suit, is very troubling"); 26 No. 7 *Federal Litigator* 9 (July 2011) ("It is difficult to imagine any document-focused litigation in which parties fail to implement litigation holds. Given the obligation to preserve relevant evidence and counsel's key responsibility in fulfilling this obligation, it is hard to comprehend not putting in place a written litigation hold. Indeed, courts are insisting on written holds with increasing frequency." (internal citation omitted)).

In addition to the reasonableness of TSCI withholding certain pieces of Payne's mail in conjunction with a possible FBI child-enticement investigation and putting a "litigation hold" on the mail when Payne filed this lawsuit, it was independently reasonable for the defendants to withhold the mail at issue because allowing Payne access to the mail might work against NDCS's rehabilitative goals for sex offenders like Payne, encourage criminal activity, and would disregard NDCS regulations that allow the withholding of materials that advocate, are likely to incite, or depict illegal sexual activity or that threaten the safety, security, or good order of the institution. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) ("prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is ill equipped to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world" (internal quotation marks and citation omitted); noting the danger that

incoming mail "reasonably may be expected to circulate among prisoners" and prisoners "may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly," including assault); *Kaden, 651 F.3d at 968* ("prison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution"); *Harper v. Wallingford, 877 F.2d 728, 730-733 (9th Cir. 1989)* (upholding ban on mail from the "North American Man/Boy Love Association"; evidence established that material could harm inmate's rehabilitation and threaten prison security because "inmates who are identified as or suspected of being pedophiles or homosexuals are a favorite target for violence since many incarcerated felons were sexually abused as children"); *McGilton v. Jesko, No. 1:06-CV-29, 2006 WL 972112, at \*2 (S.D. Ohio Apr. 12, 2006)* ("Prohibiting the possession of written materials describing sexual activity with children is not an exaggerated response to the problems posed thereby. This prohibition bears a rational relation to the legitimate penological goal of maintaining order and security within the prison and does not violate plaintiff's First Amendment rights.").

### 2. Four Pieces of Permanently Withheld Mail

The four pieces of mail the defendants seek to permanently withhold from Payne are briefly described below[6]:

(11) Two photographs of clothed young boys, one of whom appears in a potentially sexually compromising position, accompanied by a graphic story of two children acting out a sexual fantasy with an illustration of an ejaculating penis which, in accordance with the story, is likely intended to be the genital of a minor male.

---

[6]Again, the numbers below correspond to Court's Exhibit #1 from the September 11, 2015, hearing on the defendants' motion for summary judgment.

(12) A photograph of a minor male in a small swimsuit and a two-page sexually explicit joke entitled "Irish Sausages."

(13) A "Broadcast Letter" published by a "residential reintegration center . . . in support of those incarcerated for offenses against minor males and those who are sympathetic to this cause." The newsletter contains the graphic "BL," believed to mean "Boy Love" by prison officials. It also contains discussion of the author's "business venture, Inmate Book Service," which fills book orders, performs internet searches, and "other services." The newsletter quotes Bible verses that supposedly support man/boy love, discusses civil rights for "minor-attracted people," explains the author's decision to limit the focus of his newsletter to men convicted for crimes against minor males, lists contact information should inmates or other sympathetic readers wish to receive the BL newsletter, and reviews books and movies dealing with sex with minor males or that feature attractive young boys or "scenes with shirtless boys in shorts or swimming trunks or just underwear."

(14) A personal letter to Payne from the author of the BL newsletter described above. The author of the letter discusses the merits of "peoplefinder vs spokeo"; lists several names with addresses; surmises that "I think the reason we can't find a good address for Ryan is that he is a kid"; and states that "I did a quick search for porn mags for Ben, without a lot of luck." The defendants considered this as evidence of Payne's attempt to contact minors or his victims.

The defendants justify the permanent withholding of these four pieces of Payne's mail because they violate NDCS Administrative Regulations 005.03, 204.01, and 205.01; Title 68 of the Nebraska Administrative Code; and Tecumseh State Correctional Institutional Operational Memorandum 205.01.01. (Filing 133 at CM/ECF p. 17; Filing 135-1 at CM/ECF p. 4.)

Nebraska Administrative Regulation, Title 68, Chap. 3 § 002, and NDCS Operational Memorandum 205.01.01 for TSCI allow staff to withhold inmate mail

that contains materials that advocate or are likely to incite illegal activity, including materials that advocate or depict illegal sexual activity; any printed, published, or photographed material that the warden deems a threat to the safety, security, or good order of TSCI; and "any other items" that the warden construes to be a threat to the security, safety, or good order of the institution. Further, unless a victim requests to speak with an inmate, official NDCS policy precludes inmates from contacting their victims.

TSCI officials could reasonably have construed the first three of the four pieces of mail described above as advocating, depicting, or inciting sex with minor boys, especially when considering the contents of the other pieces of withheld mail. The totality of the withheld letters, photos, drawings, newsletter, and "erotic fiction" plausibly suggest that Payne could have been involved in a network of pedophiles operating both inside and outside of prisons and treatment facilities. This would pose not only a threat to minor boys outside the prison system, but a threat to the safety, security, and "good order" of TSCI if fellow inmates discovered from those mailings Payne's sexual preferences and reacted with violence. *Thornburgh*, 490 U.S. at 407-08 (noting the danger that incoming mail "reasonably may be expected to circulate among prisoners" and prisoners "may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly," including assault); *Ahlers v. Rabinowitz*, 684 F.3d 53, 65 (2nd Cir. 2012) ("Because of the state's interest in treating [a civilly committed sex offender's] sexual deviance, [state officials] had a justification for an embargo on" "images of children in bathing suits"); *Bullock v. McGinnis*, 14 F.3d 604, 1993 WL 533325, at *4 (7th Cir. Dec. 21, 1993) (unpublished disposition) (upholding prison officials' decision to withhold "mail that contained a photograph of an adult female partially exposing her genitalia to two clothed young children and two letters that referred to the photograph" from inmate who was convicted of "deviate sexual assault"; stating that, "To the extent that the prison officials' expert judgment leads them to conclude that the release of [the inmate's] mail may impede institutional security, such judgment is afforded

considerable deference."); *Harper*, 877 F.2d at 730-733 (upholding ban on mail from the "North American Man/Boy Love Association" because evidence established that such material could harm inmate's rehabilitation and threaten prison security because "inmates who are identified as or suspected of being pedophiles or homosexuals are a favorite target for violence since many incarcerated felons were sexually abused as children"); *Yeldon v. Hogan*, No. 9:08-CV-769, 2010 WL 983819, at *9 (N.D.N.Y. Mar. 15, 2010) (upholding civil commitment facility's policy that prohibited plaintiff's receipt of pictures of children under age 18 "because many residents have committed sexual offenses against children and/or have deviant sexual arousal towards children"; "Restrictions on incoming mail containing pictures of minors in [an institution of civil commitment] where many residents have committed sexual offenses against children is a policy that is rationally related to legitimate government interests."); *McGilton*, 2006 WL 972112, at *2 (prison's "regulation prohibiting plaintiff's possession of his written stories involving sexual activity between children and adults is reasonably related to the legitimate goals of prison security and inmate rehabilitation," especially since plaintiff was convicted on two counts of rape of a 9-year-old child); *Willson v. Buss*, 370 F. Supp. 2d 782, 790 (N.D. Ind. 2005) (evidence established a valid, rational connection between prison's ban on "blatantly homosexual material" and "legitimate penological interest of maintaining safety and security. Once the material enters the prison, there is no way to prevent it from being circulated throughout the prison, and anyone who comes in possession of it is in danger of sexual violence, other physical violence and extortion."); *Taniguchi v. Lappin*, No. CIV.A. 04CV304DLB, 2005 WL 1334634, at *7 (E.D. Ky. June 6, 2005) (prison mail policy allowing rejection of photographs displaying nudity, genitalia, or female breasts "advances valid penological goals of eliminating any stimulant . . . which would, or could, pose a threat to prison security, order and discipline, because it might facilitate or encourage criminal activity or interfere with rehabilitation"); *Ballance v. Virginia*, 130 F. Supp. 2d 754, 760 (W.D. Va. 2000) (confiscation of children's photographs from convicted pedophile's cell "serves to further the prison's interest in rehabilitation" and "furthered the prison's penological interests of rehabilitation and security"; noting that the inmate's possession of 406 photos of

children "could provide the deadly spark needed to create a prison wildfire. If other inmates learned that a pedophile had such a large number of childrens' pictures in his cell, the potential for a disturbance is quite great. In fact, such a discovery could even endanger [the inmate's] physical well-being. Prison officials have a duty to protect both the security of the prison and the security of each prisoner.").

The fourth piece of permanently withheld incoming mail could reasonably be construed as a response to Payne's requests to find various people, some of whom the defendants thought could be Payne's victims. The letter, written by the author of the "BL" newsletter, discusses people-finding websites; lists several names and addresses, which are the apparent results of people searches performed by the letter's author on Payne's behalf; and states that "I think the reason we can't find a good address for Ryan is that he is a kid" and "I did a quick search for porn mags for Ben, without a lot of luck." The defendants reasonably considered this as evidence of Payne's attempt to contact minors or his victims, a clear violation of NCDS policy. (Filing 135-3, Administrative Regulation 005.03, Section II(G).)

### III. CONCLUSION

After careful review of the evidence before me, construed in favor of the plaintiff, and the law existing at the time the defendants withheld 14 pieces of Payne's mail, I conclude that the defendants' decision to withhold 10 pieces of mail for four years and four pieces of mail permanently was not an exaggerated response to prison concerns. See *Florence*, 132 S. Ct. at 1517 ("in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these [legitimate security] considerations courts should ordinarily defer to their expert judgment in such matters." (internal quotation marks and citations omitted)).[7]

---

[7]*See also* *Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires . . . resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison

Therefore, the defendants did not violate clearly established constitutional law at the time of their actions, and they are entitled to qualified immunity from suit. *Hall v. Ramsey County*, ___F.3d___, 2015 WL 5314852, at *2 (8th Cir. Sept. 14, 2015) (because government officials' conduct did not violate plaintiff's constitutional rights, they were entitled to qualified immunity from suit).

Accordingly,

IT IS ORDERED:

1. The motion (Filing 132) for summary judgment based on qualified immunity filed by defendants Fred Britten, Christopher Connelly, Michelle Hillman, Lee Tinkler, Mailroom Person 1, Mailroom Person 2, Benny Noordhoek, Carina McRoberts, and J. Kunzman in their individual capacities is granted, and Plaintiff's First and Fourth Amendment claims against these defendants in their individual capacities are dismissed with prejudice;

2. This memoranda and order, along with those entered previously (Filings 20, 83, 107), dispose of all claims in this case, and final judgment will be entered by separate document;

3. Plaintiff's counsel is relieved of any further responsibility upon this court's entry of judgment.

---

administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.").

DATED this 13th day of October, 2015.

BY THE COURT:
s/ *Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.